FILED

December 8 2009

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

DA 09-0035

IN THE SUPREME COURT OF THE STATE OF MONTANA

2009 MT 418

TIM GIACOMELLI, DON HAMILTON,
YELLOWSTONE HORSE RACING ALLIANCE, INC.,
and YELLOWSTONE COUNTY, METRAPARK,

      Plaintiffs and Appellants,

  v.

SCOTTSDALE INSURANCE COMPANY,
and PAYNE FINANCIAL GROUP, INC.
d/b/a Hoiness La Bar,

      Defendants and Appellees.

APPEAL FROM:    District Court of the Thirteenth Judicial District,
                  In and For the County of Yellowstone, Cause No. DV 07-1129
                  Honorable Gregory R. Todd, Presiding Judge

COUNSEL OF RECORD:

      For Appellants:

            Allen P. Lanning, Conklin, Nybo & Lanning, P.C.;
            Great Falls, Montana

            David P. Legare, Legare Law Office; Billings, Montana

      For Appellees:

            Calvin J. Stacey; Stacey & Funyak; Billings, Montana

                            Submitted on Briefs:  October 28, 2009

                                     Decided:  December 8, 2009

Filed:

            _____
                            Clerk

Justice W. William Leaphart delivered the Opinion of the Court.

¶1 Plaintiffs Tim Giacomelli and Don Hamilton (collectively, "Jockeys") appeal the order of the District Court for the Thirteenth Judicial District, Yellowstone County, granting summary judgment in favor of Scottsdale Insurance Company (Scottsdale). We affirm.

¶2 We consider the following issues on appeal:

¶3 1. Whether the District Court erroneously interpreted the term "exhibitors" from § 23-4-205, MCA, to exclude jockeys;

¶4 2. Whether the District Court erred in holding that the Jockeys were not entitled to recovery from Scottsdale, but stated that the Jockeys had a claim against the Montana board of horseracing;

¶5 3. Whether the District Court erroneously held that the special event participant exclusion and the athletic or sports participants exclusion in the commercial general liability insurance policy (CGL policy) are unambiguous;

¶6 4. Whether the District Court erred in holding that the special event participant exclusion and the athletic or sports participants exclusion did not violate the insureds' reasonable expectations.

## FACTUAL AND PROCEDURAL BACKGROUND

¶7 The material facts in this case are undisputed. The Jockeys, Giacomelli and Hamilton, suffered injuries in horse races at MetraPark in Billings, Montana, in September 2003. Yellowstone County owns and operates MetraPark. Yellowstone

2

Horse Racing Alliance Inc. (Alliance) leased MetraPark from Yellowstone County to conduct the horse races in which the Jockeys were injured. The Jockeys sued Yellowstone County and Alliance for their injuries, alleging negligence.

¶8 Pursuant to a requirement of its lease agreement, Alliance purchased a CGL policy from Scottsdale. Yellowstone County is listed as an additional insured in the CGL policy. The CGL policy covers bodily injuries (not subject to any of numerous exclusions) arising from "the ownership, maintenance or use" of MetraPark or any operations "necessary or incidental" to MetraPark or the horse racing track. Among the exclusions are a "special event participant exclusion" and an "athletic or sports participants" exclusion. The special event participant exclusion specifies that the CGL policy does not provide coverage "to any 'participant' arising out of: 1. The practicing for or participation of any person in any athletic event, contest, game, demonstration, exhibition, race or show covered by this policy." The exclusion then defines participant to "include performers, stage-hands, volunteers, drivers, setup crew, pitcrew and other persons located in the pit area, security personnel, mechanics, stewards, officials or attendants, or any other person taking part in paragraph 1. or 2. above." The athletic or sports participants exclusion reads, "With respect to any operations shown in the Schedule, this insurance does not apply to 'bodily injury' to any person while participating in any sports or athletic contest or exhibition." The schedule refers to the operation of a "Horse Racing Track."

3

¶9 Pursuant to statute, Alliance and Yellowstone County submitted the CGL policy to the Montana board of horseracing. The board of horseracing approved the CGL policy and apparently issued a license to Alliance to conduct horse races.

¶10 After the Jockeys sued, Alliance and Yellowstone County contacted Scottsdale about insurance coverage. Scottsdale, citing the special events participant exclusion and athletic and sports participants exclusion, responded that the CGL policy did not cover the Jockeys' injuries. Consequently, Scottsdale refused to defend or indemnify Alliance and Yellowstone County.

¶11 Eventually, the Jockeys settled their suits against Alliance and Yellowstone. Pursuant to the settlements, Alliance and Yellowstone consented to the entry of judgments, the Jockeys agreed not to execute on the judgments, and Alliance assigned to the Jockeys any claims that it had against Scottsdale.

¶12 The Jockeys then filed the present declaratory judgment action, seeking a declaration that the CGL policy covered their claims and that Scottsdale had a duty to indemnify and defend Alliance and Yellowstone County. Eventually, the Jockeys moved for summary judgment to invalidate the special events participant and the athletic or sports participants exclusions for violating public policy and to enforce the remainder of the CGL policy (to provide coverage). Scottsdale opposed the motion. The District Court denied the Jockeys' motion, ruling that the exclusions do not violate public policy and are unambiguous, and that Alliance and Yellowstone had no reasonable expectation that the CGL policy would cover jockeys. The Jockeys appealed.

4

**STANDARD OF REVIEW**

¶13 We review a district court's grant of summary judgment de novo to determine if it complied with Rule 56, M. R. Civ. P. *Natl. Cas. Co. v. Am. Bankers Ins. Co. of Fla.*, 2001 MT 28, ¶ 13, 304 Mont. 163, 19 P.3d 223. Viewing the evidence in the light most flattering to the non-moving party and indulging all reasonable inferences in that party's favor, a court correctly grants summary judgment when the evidence presents no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. M. R. Civ. P. 56(c); *Peyatt v. Moore*, 2004 MT 341, ¶ 13, 324 Mont. 249, 102 P.3d 535.

¶14 We review a district court's interpretations of statutes and contracts for correctness. *Signal Perfection, Ltd. v. Rocky Mt. Bank – Billings*, 2009 MT 365, ¶ 10, 353 Mont. 237, __ P.3d __; *State v. Skyline Broadcasters, Inc.*, 2009 MT 193, ¶ 12, 351 Mont. 127, 211 P.3d 189.

**DISCUSSION**

¶15 *Issue 1: Whether the District Court erroneously interpreted the term "exhibitors" from § 23-4-205, MCA, to exclude jockeys.*

¶16 The Jockeys' principal argument is that § 23-4-205, MCA, mandates people licensed to conduct horse races to carry liability insurance covering jockeys. Consequently, they contend, the special event participant and athletic or sports participants exclusions are contrary to public policy and therefore invalid. Thus, they conclude, the Court should enforce the CGL policy—sans the exclusions—to allow the Jockeys to recover the amounts of their judgments from Scottsdale. The District Court

5

nipped this argument in the bud by rejecting its first premise: that § 23-4-205, MCA, mandates liability insurance coverage for jockeys. The Jockeys contend that this was error. The first question, consequently, is whether § 23-4-205, MCA, mandates liability insurance coverage for jockeys.

¶17   Section 23-4-205, MCA, reads, "For the protection of the public, exhibitors, and visitors, a person licensed to conduct a race meet or operate a simulcast facility under this chapter shall carry public liability insurance in an amount and form of contract approved by the board." The Jockeys insist that the term "exhibitors" should include jockeys. The District Court, in denying summary judgment to the Jockeys, did not define the term "exhibitor," but concluded that it did not include jockeys. We agree with the District Court.

¶18   Statutory interpretation, the goal of which is to give effect to the legislature's intent, begins with the text of the statute. *Smith v. Burlington N. & Santa Fe Ry.*, 2008 MT 225, ¶ 22, 344 Mont. 278, 187 P.3d 639; *Fliehler v. Unisured Employers Fund*, 2002 MT 125, ¶ 13, 310 Mont. 99, 48 P.3d 746. When the legislature has not defined a statutory term, we consider the term to have its plain and ordinary meaning. *Czajkowski v. Meyers*, 2007 MT 292, ¶ 24, 339 Mont. 503, 172 P.3d 94. To determine the meaning of a statutorily undefined term, we may consider dictionary definitions, *e.g. Colmore v. Uninsured Employers' Fund*, 2005 MT 239, ¶ 72, 328 Mont. 441, 121 P.3d 1007, prior case law, *e.g. Associated Press v. Mont. Sen. Republican Caucus*, 286 Mont. 172, 179-80, 951 P.2d 65, 69-70 (1997), and the larger statutory scheme in which the term appears,

*e.g. In re Mental Health of E.T.*, 2008 MT 299, ¶ 13, 345 Mont. 497, 191 P.3d 470. We may also consider similar statutes from other jurisdictions and legislative history for guidance in interpreting a statute. *Gannett Satellite Info. Network, Inc. v. State*, 2009 MT 5, ¶ 20, 348 Mont. 333, 201 P.3d 132; *Mont. Sports Shooting Assn. v. State*, 2008 MT 190, ¶ 25, 344 Mont. 1, 185 P.3d 1003.

¶19   Here, the term "exhibitor" is not defined in Title 23, chapter 3, MCA, which regulates horseracing at which a pari-mutuel system of wagering is used. *Webster's Third International Dictionary* defines "exhibitor" as one that "exhibits (as in an exhibition)." *Webster's Third International Dictionary* 796 (G. & C. Merriam Co. 1961). The relevant definition of "exhibit" then is "to present to view: show, display: as . . . to show publicly: put on display in order to attract notice to what is interesting or instructive or for purposes of competition or demonstration." *Webster's Third International Dictionary* 796. "Exhibition" is defined as "a public show or showing: as . . . a public display of athletic or other skill often in the form of a contest or other game but usu. without importance with respect to winning or losing." *Webster's Third International Dictionary* 796.

¶20   Here, consonant with these dictionary definitions, we determine that the exhibitors of a horse race where pari-mutuel wagering occurs are those people who organize the horse race—not the jockeys, who are the participants in the exhibition. The legislature originally defined "race meet" as "any exhibition of thoroughbred, purebred, and/or registered horse racing where the pari-mutuel system of wagering is used." 1965 Mont.

7

Laws ch. 196, sec. 2(3). In light of this definition, we conclude that an "exhibitor" as originally used in § 23-4-205, MCA, means one who exhibits "as an exhibition." *Webster's Third International Dictionary* 796. The exhibition is the entire spectacle of the horse race—not, as the Jockeys propose, the exhibition of the strength, speed, and endurance of each individual horse. The organizers of the race present this exhibition, not the individual jockeys.

¶21 That the term "exhibitor" does not include participants finds support in similar racing statutes from neighboring jurisdictions. Colorado requires people licensed to conduct race meets to carry public liability insurance to protect "the public and the exhibitors, *contestants*, and visitors." Colo. Rev. Stat. § 12-60-509(1) (2009) (emphasis added). New Mexico and Oregon have similar statutes that distinguish between exhibitors of races and participants in the races. *See* N.M. Stat. § 60-2D-12(A) (2009) (requiring licensees of pari-mutuel bicycle racing to carry public liability insurance "for the protection of the public, exhibitors, *contestants*, visitors, other licensees and spectators" (emphasis added)); Or. Rev. Stat. § 462.110(1), (5) (2007) (mandating race licensees to carry liability insurance coverage to protect "the public, and all members thereof, the exhibitors and visitors" and additional insurance to protect "jockeys and, if appropriate, drivers"); *see also Ross v. Golden St. Rodeo Co.*, 165 Mont. 337, 348, 530 P.2d 1166, 1172 (1974) (Daly, J., dissenting) (referring to rodeo company, rather than bull rider, as exhibitor of bull).

¶22 The Jockeys, in support of their contention that the term "exhibitors" includes jockeys, cite a number of cases in which courts refer to horse riders as exhibitors. We, however, find these cases distinguishable. In *Hoyt v. Northern Maine Fair Assn.*, 118 A. 290, 292 (Me. 1922), the Maine Supreme Court observed:

> Within the scope and purpose of the larger fairs is included another class of exhibitors invited for precisely the same purpose as those named, and, an important purpose of inviting this class is to offer such attractions and exhibitions as will appeal to the sporting sense of the public and to allure them to the fair grounds to witness the sports of the day. This class of exhibitors is composed of the horsemen, who come to exhibit their horses in the races and unquestionably furnish by far the most attractive display of the entire exhibition and become the most important source of revenue, a consideration not only desirable but essential to the success of most large fairs.

The court further explained that at a state fair the horsemen show horses, "results of good husbandry . . . , including draught, family and trotting horses . . . for the purpose of stimulating an interest and arousing increased activity in the departments of agricultural opportunity." *Hoyt*, 118 A. at 292. In this context, the riders exhibit the qualities of the horses, and are rightly considered "exhibitors." We cannot say that this is the case with jockeys who race horses at meets where the purpose is not to display the "results of good husbandry" to stimulate interest and activity in agriculture, but rather to allow pari-mutuel wagering. Thus, we find the statements from *Hoyt* unpersuasive in this case. For this same reason, we also distinguish *Haynes v. County of Missoula*, 163 Mont. 270, 517 P.2d 370 (1973), *Lindemann v. American Horse Shows Assn.*, 164 Misc. 2d 937 (N.Y. Sup. 1994), and *Morrison v. Union Park Assn.*, 149 A. 804 (Me. 1930), which all involve either county fairs or horseshows, but not horse races with pari-mutuel betting.

¶23    The Jockeys next advance that the District Court erroneously disregarded Rule 32.28.501(10), Admin. R. M., when it interpreted § 23-4-205, MCA. This rule reads, "Every track licensee shall have on file with the board at least ten days prior to the opening of any race meeting, a copy of an adequate liability insurance contract *covering all persons at the race meeting*." Admin. R. M. 32.28.501(10) (2009) (emphasis added). The Jockeys assert that this rule supports their reading of § 23-4-205, MCA. Citing *Kuhr v. City of Billings*, 2007 MT 201, ¶ 29, 338 Mont. 402, 168 P.3d 615, the Jockeys further contend that the District Court was required to take judicial notice of the rule and enforce it (presumably by invalidating the special event participant exclusion and the athletic or sports participants exclusion) because it does not add to the requirements of § 23-4-205, MCA, and because it helps effectuate the intent of § 23-4-205, MCA. We are unpersuaded by this argument.

¶24    Assuming for the sake of argument that Rule 32.28.501(10), Admin. R. M., requires coverage of jockeys,[1] then it would be invalid and not subject to judicial notice. In *Kuhr* we wrote, "An administrative rule will be considered invalid 'only upon a clear showing that the regulation adds requirements which are contrary to the statutory language or that it engrafts additional provisions not envisioned by the legislature.'" *Kuhr*, ¶ 29 (quoting *Christenot v. State*, 272 Mont. 396, 400, 901 P.2d 545, 548 (1995)). Here, given our conclusion that § 23-4-205, MCA, does not require persons licensed to

---

[1] Rule 32.28.501(10), Admin. R. M., requires coverage of "all persons at the race meeting." It is unclear whether the board of horseracing intended this to apply to jockeys who are not "at" the race meeting, but are "in" the race meeting. In any case, we need not resolve this issue here.

10

conduct a horse race to carry public liability insurance for jockeys, Rule 32.28.501(10), Admin. R. M.—as interpreted by the Jockeys—would engraft an additional requirement onto the statute. Consequently, if Rule 32.28.501(10), Admin. R. M., required liability insurance covering jockeys, then it would be invalid and irrelevant to the District Court's analysis. Thus, the Jockeys' argument fails.

¶25 For the foregoing reasons we hold that the District Court did not err in concluding that the term "exhibitors"—as used in § 23-4-205, MCA—does not include jockeys. Therefore, the District Court correctly dismissed the Jockeys' argument that the special event participant and athletic and sports participants exclusions violate public policy.

¶26 *Issue 2: Whether the District Court erred in holding that the Jockeys are not entitled to recover from Scottsdale, but stated that they had a claim against the state board of horseracing.*

¶27 In its order denying the Jockeys' motion for summary judgment, the District Court wrote:

> The statute itself requires the insurance contract obtained for horseracing to be "*in an amount and form of contract approved by the board.*" The State of Montana approved the insurance contracts submitted by the County and the Alliance for several years. The evidence of this approval is in the licenses being issued and horse races being conducted. If the insurance policies had defective coverage based on certain exclusions, the Plaintiffs have a claim against the board, not the defendants.

(Citation omitted.) The Jockeys assert that the District Court erred in suggesting that they had a claim against the board of horseracing. The correct remedy, the Jockeys

11

maintain, when an insurance contract violates Montana law, is to void the offending provision and enforce the remainder of the contract.

¶28 This argument has no merit because we have already concluded that the exclusion in the CGL policy did not violate Montana law. Accordingly, the Jockeys' proposed remedy is not available. Furthermore, the District Court's suggestion that the Jockeys have a claim against the board of horseracing was merely obiter dicta. *Black's Law Dictionary* 1102 (defining "obiter dictum" as "[a] judicial comment made while delivering a judicial opinion, but one that is unnecessary to the decision in the case and therefore not precedential"). As such, it is not an appropriate basis for an assignment of error.

¶29 ***Issue 3: Whether the District Court erroneously held that the special event participant exclusion and the athletic or sports participants exclusion in the CGL policy are unambiguous.***

¶30 The Jockeys next contend that the District Court erred in holding that the special event participant exclusion and the athletic or sports participants exclusion are unambiguous.

¶31 When the language of an insurance contract is ambiguous, courts construe the ambiguous provisions against the insurer and in favor of extending coverage. *Modroo v. Nationwide Mut. Fire Ins. Co.*, 2008 MT 275, ¶ 23, 345 Mont. 262, 191 P.3d 389. Courts do so to further the object of the insurance contract, which is to give protection, *Natl. Farmers Union Prop. & Cas. Co. v. George*, 1998 MT 205, ¶ 12, 290 Mont. 386, 963

P.2d 1259, and because insurers draft the language of insurance contracts, *see Pablo v. Moore*, 2000 MT 48, ¶ 22, 298 Mont. 393, 995 P.2d 460.

¶32 A contract provision is ambiguous if it is susceptible, without violence, to more than one reasonable interpretation. *Modroo*, ¶ 23; *Libby Lumber Co. v. Pacific Sts. Fire Ins. Co.*, 79 Mont. 166, 175, 255 P. 340, 343 (1927). Whether a provision is ambiguous is a question of law, which courts resolve from the viewpoint of the layperson "untrained in the law or the insurance business." *Modroo*, ¶ 23. "Ambiguity does not exist just because a claimant says so," *Holmstrom v. Mut. Benefit Health & Accident Assn.*, 139 Mont. 426, 428, 364 P.2d 1065, 1066 (1961), or just because the parties disagree as to the meaning of the contract provision, *Dollar Plus Stores, Inc. v. R-Mont. Assocs., L.P.*, 2009 MT 164, ¶ 17, 350 Mont. 476, 209 P.3d 216. Further, courts will not distort contractual language to create an ambiguity where none exists. *See Johnson v. Eq. Fire & Marine Ins. Co.*, 142 Mont. 128, 131, 381 P.2d 778, 779 (1963) (emphasizing that courts may not "seize upon certain and definite covenants expressed in plain English with violent hands, and distort them so as to include a risk clearly excluded by the insurance contract" (quoting *Mitchell v. German Com. Accident Co.*, 161 S.W. 362, 363 (Mo. App. 1913))).

¶33 Here, we need not address the special events participant exclusion, because the athletic or sports participants exclusion is dispositive. The athletic or sports participants exclusion provides, "With respect to any operations shown in the Schedule, this insurance does not apply to 'bodily injury' to any person while participating in any sports or

athletic contest or exhibition." The schedule contains the following provision: "Description of Operations: Horse Racing Track."

¶34 This provision applies generally to operations of the horse racing track. Here, the Jockeys' theories of liability all pertain to Alliance's operations of the racetrack. As a result of Alliance's mismanagement of the racetrack, the Jockeys allege, they were injured while participating in horse races. The Jockeys' theories of liability and allegations fit neatly within the language of the athletic or sports participants exclusion. Accordingly, we conclude that the District Court did not err in holding that the Jockeys' claims are excluded under the unambiguous terms of the CGL policy.

¶35 The Jockeys argue that the athletic or sports participants exclusion is ambiguous because it could also be reasonably interpreted to "apply only to injuries arising from the natural or inherent risks of horse racing," but not to "injuries allegedly caused by an insured's breach of duty to design, inspect, maintain, or operate the race track in a safe condition before the race." We find no support for this interpretation in the language of the exclusion. Indeed, to read such a limitation into the athletic or sports participants exclusion would be to distort or "do violence" to the language of the policy. This we decline to do. *Johnson*, 142 Mont. at 131, 381 P.2d at 779; *Libby Lumber*, 79 Mont. at 175, 255 P. at 343.

¶36 The Jockeys further contend that the athletic and sports participants exclusion is ambiguous because there is a split in authorities that have construed similar contractual provisions. The Louisiana Court of Appeals, the Jockeys point out, held that a similar

14

exclusion did not exclude coverage of injuries suffered by a jockey during a practice race where the jockey alleged "negligent failure to maintain the racetrack and failure to provide adequate medical care following the accident." *Colson v. La. St. Racing Commn.*, 726 So. 2d 432, 433-35 (La. App. 4th Cir. 1999). Subsequently, the Federal District Court for the Middle District of Florida distinguished *Colson* and held that a similar exclusion excluded coverage of injuries suffered by pugilists during a match where the fighters alleged negligence by the promoters before and after the fight. *Natl. Fire & Marine Ins. Co. v. Adoreable Promotions, Inc.*, 451 F. Supp. 2d 1301, 1307-10 (M.D. Fla. 2006). This split in authority, the Jockeys advance, demonstrates that the exclusion in the CGL policy here is ambiguous.

¶37 The Jockeys' argument requires us to clarify a statement from prior case law. In *Wendell v. State Farm Mutual Automobile Insurance Co.*, 1999 MT 17, ¶ 29, 293 Mont. 140, 974 P.2d 623, we stated, "The fact that courts are split as to the meaning of 'accident' further confirms our belief that the term is subject to more than one reasonable interpretation." The Jockeys read this statement, as subsequently repeated in *Pablo v. Moore*, 2000 MT 48, ¶ 15, 298 Mont. 393, 995 P.2d 460, to mean that a split in authority with respect to a contractual term conclusively demonstrates that the term is ambiguous.

¶38 While we did ultimately conclude in both *Pablo* and *Wendell* that the terms in question were ambiguous, *Pablo*, ¶ 16; *Wendell*, ¶ 41, we do not read these cases to establish the rule that the Jockeys advocate. In both *Pablo* and *Wendell*, we noted the split in authority as additional support for concluding that there was ambiguity. *Pablo*,

15

¶ 16; *Wendell*, ¶ 29. Thus, neither case stated that a split in authority conclusively demonstrates ambiguity. Furthermore, the rule advanced by the Jockeys is inconsistent with the role of the Court in determining whether a contract is ambiguous. As the Maryland Court of Appeals observed, "Surely we would be abdicating our judicial role were we to decide such cases by the purely mechanical process of searching the nation's courts to ascertain if there are conflicting decisions." *Sullins v. Allstate Ins. Co.*, 667 A.2d 617, 624 (Md. 1995) (quoting *Lower Paxton Township v. U.S. Fid. & Guar. Co.*, 557 A.2d 393, 400 n. 4 (Pa. Super. 1989)). We determine that the better rule is that a split in authority over the interpretation of language in an insurance policy does not conclusively establish ambiguity, but rather is a *factor* that we will consider in determining whether ambiguity exists. *See Sullins*, 667 A.2d at 624 (announcing similar rule).

¶39 Applying this rule, we conclude that the split in authority with respect to the athletic or sports participants exclusion does not render the policy language in this case ambiguous. In particular, we do not find *Colson*, a decision from an intermediate court of appeals in Louisiana, persuasive or analogous to this case. First, the court in *Colson* failed to analyze the language of the exclusion, and simply made the conclusory statement that the exclusion did not apply because the plaintiff's claims were "independent" of his participation in the race. 726 So. 2d at 435. Moreover, in *Colson*, unlike the present case, the plaintiff alleged harm caused by inadequate medical care after the race, and the court stated that the plaintiff's "personal injuries sustained in the

16

accident which occurred during [the] race are clearly excluded from coverage." *Colson,* 726 So. 2d at 435. Here, conversely, the Jockeys have only alleged injuries that occurred during the races. Thus, we find *Colson* of little help in interpreting the athletic or sports participants exclusion. Accordingly, we hold that the District Court did not err in concluding that the athletic or sports participants exclusion is unambiguous.

¶40    ***Issue 4: Whether the District Court erred in holding that the special event participant exclusion and the athletic or sports participants exclusion did not violate the reasonable expectations of Alliance and Yellowstone County.***

¶41    The Jockeys' final argument is that the District Court erred in holding that the special event participant exclusion and the athletic or sports participants exclusion violated their reasonable expectations of coverage.

¶42    "The reasonable expectations doctrine provides that the objectively reasonable expectations of insurance purchasers regarding the terms of their policies should be honored notwithstanding the fact that a painstaking study of the policy would have negated those expectations." *Am. Family Mut. Ins. Co. v. Livengood*, 1998 MT 329, ¶ 32, 292 Mont. 244, 970 P.2d 1054. The genesis of this doctrine is "the judicial recognition that most insurance contracts, rather than being the result of anything resembling equal bargaining between the parties, are truly contracts of adhesion in which many insureds face two options: (1) accept the standard insurance policy offered by the insurer, or (2) go without insurance." *Couch on Insurance* vol. 2, § 22:11, 22-23 (3d ed., Lee R. Russ & Thomas F. Segalla, eds., Thompson West 1997) (citation omitted); *see also*

17

*Transamerica Ins. Co. v. Royle*, 202 Mont. 173, 180-81, 656 P.2d 820, 824 (1983) (applying reasonable expectations doctrine to invalidate exclusion because automobile insurance policy was "adhesion contract"). The reasonable expectations doctrine, however, "is inapplicable where the terms of the policy at issue clearly demonstrate an intent to exclude coverage." *Livengood*, ¶ 33. This is because expectations "contrary to a clear exclusion are not 'objectively reasonable.'" *Livengood*, ¶ 33 (quoting *Wellcome v. Home Ins. Co.*, 257 Mont. 354, 359, 849 P.2d 190, 194 (1993)).

¶43 Here, Alliance and Yellowstone County expected the CGL policy to cover injuries to jockeys. This expectation, however, was not objectively reasonable. Contrary to the Jockeys' assertions, we have concluded that the athletic or sports participants exclusion unambiguously expresses an intent to exclude coverage for jockeys injured while participating in horse races. Accordingly, we hold that the District Court did not err.

¶44 The Jockeys, noting that both exclusions refer to "exhibitions," assert that it is inconsistent to interpret the exclusions to apply to jockeys while interpreting § 23-4-205, MCA, which is for the protection of "exhibitors," to not apply to jockeys. We are unconvinced by this argument. First, the CGL policy excludes coverage for participants in a "sports or athletic contest *or* exhibition" (emphasis added). The horse races in which the Jockeys were injured qualify as "sports or athletic contests." Therefore, we need not address the term "exhibition" as used in the CGL policy exclusions. Second, the Jockeys' charge of inconsistency is illusory. According to our interpretation of § 23-4-205, MCA, a jockey participating in an exhibition of horseracing is not an "exhibitor,"

18

but a "participant." The "exhibitor" is the organizer of the horse race. Given these definitions, there is no inconsistency in applying the athletic or sports participants exclusion to jockeys, as participants in an exhibition, while not applying the protection of "exhibitors" in § 23-4-205, MCA, to jockeys (because the organizers, not the jockeys, are the exhibitors).

¶45 Affirmed.

/S/ W. WILLIAM LEAPHART

We concur:

/S/ MIKE McGRATH
/S/ JAMES C. NELSON
/S/ JIM RICE
/S/ BRIAN MORRIS